STATE OF NORTH CAROLINA v. EDDIE JUNIOR SPINKS, Defendant

No. COA99-94

(Filed 21 December 1999)

## 1. Constitutional Law— speedy trial—prejudice from delay

The State did not violate defendant's constitutional right to a speedy trial for murder where defendant was charged on 13 July 1992, his first trial ended with a jury unable to reach a verdict and a mistrial in March of 1993, and the case was not again calendared for trial until April of 1998. Defendant failed to show that the delay was due to the neglect or wilfulness of the prosecutor and failed to show prejudice from the delay in that he did not call the missing witnesses at his first trial and did not request a speedy trial during the delay.

## 2. Evidence— recorded recollection—statement not written or recalled by witness—impeachment

The trial court erred in the retrial of a murder defendant five years after the original trial by admitting a written pretrial statement by a State's witness where the witness's recollection of the events was not clear but there was no showing that the statement was made or adopted when the matter was fresh in the witness's memory and that it reflected her knowledge correctly. Her subsequent testimony made clear that she did not write the statement herself, did not read it before signing it, did not recall the matters in the statement, and disagreed with some of it. There was no foundation for suggesting that the statement was independently admissible and it was not used properly to impeach her because she denied making some of the prior statements. N.C.G.S. § 8C-1, Rule 803.

## 3. Evidence— waiver of objection—cross-examination

Defendant in a murder prosecution did not waive his objection to a written statement by a State's witness when he cross-examined her for the purpose of showing that the statement was unreliable. Defendant did not refer to or rely upon portions of the statements as substantive evidence.

Appeal by defendant from judgment entered 1 May 1998 by Judge W. Douglas Albright in Randolph County Superior Court. Heard in the Court of Appeals 28 October 1999.

Eddie Junior Spinks (defendant) was tried at the 20 April 1998 Session of Randolph County Superior Court for the murder of William Lacy Marley (Marley). Evidence for the State tended to show that on 27 March 1992, defendant was "hanging out" at the mobile home residence of Mr. Russell Lineberry in the vicinity of Ramseur, North Carolina. Eric Gladden and Ronald McKenzie were also among the individuals at the Lineberry residence that day. The victim Marley, also known as "Big Daddy," came to Lineberry's residence, and Marley and defendant began arguing. Marley accused the defendant of "messing with his girl-friend." Shortly after their argument, Marley left the residence and walked toward his vehicle. McKenzie testified that defendant, who was holding a rifle with a banana clip, followed Mr. Marley outside the trailer and said, "you didn't know I had this on me, you MF." McKenzie further testified that he then heard a shot, following which Marley got into his car and drove off. Defendant, McKenzie, and Gladden remained at Lineberry's trailer. About twenty to thirty minutes later, Marley returned to the trailer. Marley parked his car across the road in front of the trailer, and walked toward the trailer with a shotgun in his hands. As Marley approached the trailer, three or four shots were fired from the trailer. The bullets struck Marley, his shotgun discharged into the air, and Marley fell to the ground. Marley then got up and staggered back to his vehicle. Someone then took Marley to the hospital.

Dwayne Lassiter testified for the defendant that defendant and Marley fired at about the same time. Defendant testified that prior to the day of the shooting he had been told by both Dwayne Lassiter and Tito Alston, that "Big Daddy" was looking for him and had threatened to kill him. As a result, defendant said he went home, got his gun and put it in the car. Defendant testified that he and Marley argued when Marley came to the trailer, Marley stating that the defendant had said something out of the way to his girlfriend. According to defendant, Marley kept pushing him, and Marley stated that when he returned to the trailer "he was going to blow the motherf---g doors off." Defendant explained that he followed Marley out of the trailer to his car because Marley had said he was coming back and defendant did not know whether Marley had a gun in his car. The argument continued while defendant was standing by the passenger side of Marley's car and Marley was standing by the driver's side of the car. Marley then stated, "I'll be back, you know." Defendant further testified he had his finger on the trigger of the rifle he was holding, and the rifle accidentally dis-charged into the ground. Defendant testified that he then left the trailer "cause [he] didn't want no trouble"; that Marley returned with a shot-

gun, screaming "Come out motherf----r; Where you at; I'm going to kill you!" Defendant said that Marley went inside the trailer while defendant was sitting in the nearby woods, and that Marley continued to scream and yell. Defendant further testified that when Marley left, defendant returned to the trailer and was standing in the yard when Marley again returned to the trailer. Defendant ran into the house and watched Marley from a window. When Marley approached the trailer with his shotgun, defendant testified that Marley's gun went up and defendant heard a shot; that defendant pointed his gun out of the window and began shooting. Three bullets from defendant's rifle entered the front of Marley's body. Officers of the Randolph County Sheriff's Department testified that they found six spent twenty-two caliber shell casings inside the mobile home and two spent sixteen-gauge shotgun shells in the yard of the mobile home.

Defendant was convicted of second-degree murder. From the imposition of judgment based on the jury verdict, defendant appealed.

*Attorney General Michael F. Easley, by Assistant Attorney General T. Brooks Skinner, Jr., for the State.*

*Bell & Browne, P.A., by Charles T. Browne, for defendant appellant.*

HORTON, Judge.

Defendant contends that the trial court (I) erred in denying his constitutional right to a speedy trial, (II) committed prejudicial error by excluding evidence of an uncommunicated threat made by the deceased against defendant, (III) committed prejudicial error by admitting into evidence a written pretrial statement of a witness for the State, (IV) erred in denying his motion to dismiss at the close of the State's case and at the close of all the evidence, and (V) erred in failing to properly instruct the jury on self-defense.

### Right to Speedy Trial

[1] Defendant contends the trial court erred in denying his motion to dismiss on the grounds that the State violated the defendant's constitutional right to a speedy trial. The State charged defendant with murder on 13 July 1992, and he was tried at the 15 March 1993 Criminal Session in Randolph County Superior Court. The jury was unable to reach a verdict and the trial judge declared a mistrial. Defendant's case was not again calendared for trial until the 20 April 1998

Criminal Session in Randolph County Superior Court, more than five years later. In his pretrial motion to dismiss, defendant maintained he was prejudiced by the delay in his second trial because he was having difficulty locating witnesses whose whereabouts were known in 1993. The State argued, among other things, that a large number of murder cases were pending in the district and that defendant's case had already been tried once, resulting in a hung jury. Upon hearing the arguments of the State and of defense counsel, the trial judge denied defendant's motion to dismiss.

The right to a speedy trial is different from other constitutional rights in that, among other things, deprivation of a speedy trial does not *per se* prejudice the ability of the accused to defend himself; it is impossible to determine precisely when the right has been denied; it cannot be said precisely how long a delay is too long; there is no fixed point when the accused is put to a choice of either exercising or waiving his right to a speedy trial; and dismissal of the charges is the only possible remedy for denial of the right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 33 L.Ed. 2d 101, 92 S.Ct. 2182 (1972).

So, unless a fixed time limit is prescribed by statute, a claim that a speedy trial has been denied must be subjected to a balancing test in which the court weighs the conduct of both the prosecution and the defendant. The main factors which the court must weigh in determining whether an accused has been deprived of a speedy trial are (1) the length of the delay, (2) the cause of the delay, (3) waiver by the defendant, and (4) prejudice to the defendant. No single factor is regarded as either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." . . .

Thus the circumstances of each particular case must determine whether a speedy trial has been afforded or denied, and the burden is on an accused who asserts denial of a speedy trial to show that the delay was due to the neglect or wilfulness of the prosecution. An accused who has caused or acquiesced in the

delay will not be allowed to use it as a vehicle in which to escape justice.

*State v. McKoy*, 294 N.C. 134, 140-41, 240 S.E.2d 383, 388 (1978) (citations omitted). With regard to the third factor, waiver by defendant, the U.S. Supreme Court has held that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker v. Wingo*, 407 U.S. 514, 532, 33 L. Ed. 2d 101, 118 (1972). Applying the reasoning of *McKoy* to the case before us, we hold the trial court did not err in denying defendant's motion to dismiss. Defendant failed to show that the delay was due to the neglect or wilfulness of the prosecution. Defendant contends that, because of the five-year delay in recalling his case, he has been unable to locate two witnesses in preparation for his defense of the second trial. The record reveals, however, that defendant failed to call all his witnesses in the first trial. At the pretrial hearing, upon inquiry by the trial court, defense counsel considered one of the witnesses to be crucial to the defense, but the witness was not called in the first trial. In denying defendant's motion to dismiss, the trial judge noted, among other things, that

> Number. No speedy trial motion has heretofore been filed by the defendant demanding a trial of any sort until the motion was filed on Wednesday prior to the convening of this Session . . . .
>
> . . . .
>
> Number. Attorney Browne defended the defendant at the prior trial. The defendant's contention that these witnesses are crucial and material is somewhat undercut by the fact that neither of those witnesses was considered crucial enough to be called at the prior trial.
>
> Number. Other witnesses are currently available to the defendant as to the facts and circumstances surrounding the fatal encounter. Alston and Brooks are not the sole witnesses who can supply these details.
>
> Number. Although this case has been lingering on the docket following the mistrial in 1993 the press of other cases and trials and the presentation of a number of capital murder trials have consumed the intervening court sessions.

For the above reasons, and particularly considering that defendant never requested a speedy trial during the five-year interval following

his first trial, defendant has failed to show how he has been preju-
diced by the delay, and we hold the trial court did not err in denying
defendant's motion to dismiss. This assignment of error is overruled.

## Admission of Written Pretrial Statement

[2] Defendant also argues the trial court committed reversible error
by admitting into evidence a written pretrial statement of Catherine
Yancey, a witness for the State. Because Yancey's memory of the
events of 27 March 1992 was not clear, the State requested her to read
a statement marked State's Exhibit 14 to refresh her recollection.
Exhibit 14 was represented to be a summary of Yancey's oral state-
ment, as written by a police investigator in the course of his investi-
gation of this case. After reading over the written statement, Yancey
said "she remember[ed] some of this," but it soon became apparent
that she was not able to testify from her "refreshed" memory: "I can't
tell you exactly who said what." When the District Attorney began to
go over the statement with Yancey, she began to take issue with cer-
tain matters set forth in the statement. When asked whether she had
read the document prior to signing it, Yancey stated, "I didn't even
read it. I just signed this piece of paper." After Yancey said she could
not remember some parts of the statement, the State introduced the
statement into evidence over the objection of defendant. The State
then had Yancey read the entire statement to the jury.

N.C. Gen. Stat. § 8C-1, Rule 803(5) (1992) of the North Carolina
Rules of Evidence provides:

> The following [is] not excluded by the hearsay rule, even
> though the declarant is available as a witness:
>
> . . . .
>
> (5) Recorded Recollection.—A memorandum or record concern-
> ing a matter about which a witness once had knowledge but
> now has insufficient recollection to enable him to testify
> fully and accurately, shown to have been made or adopted
> by the witness when the matter was fresh in his memory and
> to reflect that knowledge correctly. If admitted, the memo-
> randum or record may be read into evidence but may not
> itself be received as an exhibit unless offered by an adverse
> party.

The rule applies in an instance where a witness is unable to remem-
ber the events which were recorded, but the witness recalls having

made the entry at a time when the fact was fresh in her memory, and the witness knew she recorded it correctly. *See* Brandis & Broun on North Carolina Evidence, § 224, p. 110 (5th ed. 1998). "In this instance, the writing itself is the evidence and, but for the existence of a hearsay exception, inadmissible. Rule 803(5) supplies the exception." *Id.* Further, "[t]he record need not have been made by the witness herself; it is enough that she be able to testify that [1] she saw it at a time when the facts were fresh in her memory, and that [2] it actually represented her recollection at the time." *Id.* at 111. If the trial court determines that the recorded recollection is admissible as an exception to the hearsay rule, Rule 803(5) allows the statement to be read into evidence, but the statement not may not be received as an exhibit unless offered by an adverse party. The rationale behind the last sentence of the Rule is "[t]o prevent a jury from giving too much weight to a written statement that cannot be effectively cross-examined . . . ." N.C. Gen. Stat. § 8C-1, Rule 803, Commentary, p. 177.

Here, the trial court erred in allowing the statement to be read into evidence without a showing that the statement "was made or adopted by [Yancey] when the matter was fresh in [her] memory and to reflect that knowledge correctly." Subsequent to the admission of the statement, Yancey's testimony makes it clear that not only does she not recall the matters in the statement, she disagrees with some of the statements found therein. It appears from Yancey's testimony that she did not write the statement herself, and that she did not read it before signing it. The State offered no evidence to the contrary. Further, by the plain language of Rule 803(5), it was error to admit the written statement as an exhibit. *See State v. Hollingsworth,* 78 N.C. App. 578, 581, 337 S.E.2d 674, 676-77 (1985) (trial court erred in admitting letter as a recorded recollection where witness testified that when she wrote the letter, it did not correctly reflect her knowledge of the events and she did not know facts that she had forgotten by the time of the trial). It appears that the State was anxious to admit the written statement of Yancey into evidence because it contained the following statement allegedly made by the defendant prior to the shooting: "if Big Daddy came down that he was going to shoot Big Daddy." The prejudice to defendant's claim of self-defense is obvious, particularly considering that no other witness testified that defendant stated he was going to shoot Marley if he returned to the trailer. Further, Yancey's testimony on cross-examination demonstrated that she was not even present at the trailer prior to the shooting at a time when she could have heard the defendant make such a threat towards the victim. The State argues that

the written statement of Yancey was not offered as substantive evidence, but was used either to refresh her recollection or to impeach her credibility. *State v. Demery*, 113 N.C. App. 58, 67, 437 S.E.2d 704, 710 (1993). In the alternative, the State contends that defendant waived his objection to the admission of the statement as an exhibit when defendant cross-examined Yancey about the recorded statement. *Id.* We disagree.

**[3]** We have already discussed briefly the issue of present recollection refreshed; after reading the statement, Yancey was able to recall some parts of the statement from her refreshed memory, but also denied making or was unable to recall other parts of the document. The use of a document in order to refresh a witness' recollection does not make it admissible if offered by the party calling the witness, although it may be admissible for other reasons. Brandis & Broun on North Carolina Evidence, § 172, p. 570. Here, the State's attempt to refresh the witness' recollection was unsuccessful, and no foundation was laid to suggest that the recorded statement was independently admissible. *See* N.C. Gen. Stat. § 8C-1, Rule 901(a). Yancey did not authenticate the statement by acknowledging she made the statement, nor did the State call the investigating officer to testify that she made the statement which he recorded.

Regarding the issue of impeachment, the State argues that Yancey's testimony was inconsistent with some of the statements she made to the police at the time of the shooting, and therefore the recorded statement was admissible for impeachment purposes.

North Carolina Rule of Evidence 607 allows a party to impeach its own witness, and Rule 611 allows the use of leading questions on direct examination of a hostile witness. N.C. Gen. Stat. § 8C-1, Rules 607 & 611 (1994). Furthermore, the State may attempt to impeach a hostile witness by asking him whether he previously made certain prior inconsistent statements. N.C. Gen. Stat. § 8C-1, Rule 607 (1994); *State v. Hunt*, 324 N.C. 343, 348, 378 S.E.2d 754, 757 (1989). However, impeachment by a prior inconsistent statement may not be permitted where it is used as a mere subterfuge to get evidence before the jury which is otherwise inadmissible. *Hunt*, 324 N.C. at 349, 378 S.E.2d at 757 (citations omitted) (State improperly attempted to impeach its own witness by calling the detective to whom the witness had made a prior inconsistent statement and having him read the entire statement into the record).

*State v. Price*, 118 N.C. App. 212, 216, 454 S.E.2d 820, 822-23, *disc. review denied*, 341 N.C. 423, 461 S.E.2d 766 (1995). *Demery* is distinguishable on its facts from the case before us. In *Demery*, we reasoned that "[i]t is permissible to use a prior statement to impeach a witness where there is *proof* that on another occasion he has made statements inconsistent with his testimony. At trial, Brooks acknowledged having made the prior statement." *Demery*, 113 N.C. App. at 67, 437 S.E.2d at 710 (emphasis added) (citations omitted). Here, although Yancey admitted to *signing* the recorded statement, she denied making some of the prior statements. Yancey specifically denied that she heard the defendant state that, "if Big Daddy came down there that he was going to shoot him." There is no competent evidence of record to suggest that Yancey made the statements as summarized in the police investigator's notes.

Lastly, the State contends that defendant waived his objection to the admission of Yancey's statement when defendant cross-examined her about the statement. We disagree.

Under the equally well-established exception to the waiver rule, a timely objection is not waived when the objecting party later offers evidence "for the purpose of impeaching the credibility or' establishing the incompetency of the testimony in question."

*State v. Townsend*, 99 N.C. App. 534, 537, 393 S.E.2d 551, 553 (1990) (citations omitted). Here, defendant cross-examined Yancey for the purpose of showing that the statement was unreliable. Defendant did not refer to, nor rely upon, portions of the statements as substantive evidence.

In conclusion, the purported summary of Yancey's oral statement marked State's Exhibit 14, which was allegedly written by an investigating officer who was not called as a witness by the State, was not admissible in evidence as a recorded recollection of Yancey under the plain language of Rule 803(5). Further, the statement did not serve to refresh the witness' recollection, nor was it properly used to impeach her. Finally, defendant's objection to the offer of State's Exhibit 14 in evidence was not waived. The admission of Yancey's written statement into evidence was prejudicial error, and entitles defendant to a new trial.

In light of our decision, we decline to consider defendant's remaining assignments of error, as they are not likely to recur upon a new trial.

New trial.

Judges McGEE and EDMUNDS concur.